702 So.2d 727 (1997)
Bettie SMITH, Plaintiff-Appellee,
v.
OUACHITA PARISH SCHOOL BOARD and Lanny Johnson, Superintendent, Defendants-Appellants.
No. 29873-CA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 1997.
*729 Noah, Smith & Newman by Todd G. Newman, Monroe, for Defendants-Appellants.
Kidd-Culpepper by Paul Henry Kidd, Monroe, for Plaintiff-Appellee.
Before MARVIN, C.J., and WILLIAMS and GASKINS, JJ.
MARVIN, Chief Judge.
In this action arising out of the defendant school board's alleged demotion of Bettie Smith, a tenured teacher who served as a guidance counselor, the Board appeals a judgment awarding Ms. Smith $25,000 in damages, plus lost wages, medical specials and attorney's fees. The Board complains of the trial court's findings that the Board intentionally inflicted emotional distress and failed to afford due process rights to Ms. Smith, contrary to the provisions of La. R.S. 17:444 and 42 U.S.C. § 1983. Answering the appeal, Ms. Smith seeks to increase the general damage award.
The issues are whether Ms. Smith was "promoted" from a "lower [salaried] position" to "a higher [salaried] position" of guidance counselor in accord with La. R.S. 17:444 and whether Ms. Smith had a "property right" entitling her to due process before the Board could remove her from the guidance counselor position.
We affirm the judgment.

FACTS
Employed by the Board in the Ouachita Parish school system since 1969, Ms. Smith was a tenured teacher of business courses through the 1986-87 school year, with a master's degree and 30 graduate hours in secondary guidance and counseling. In September 1987, the Board assigned Ms. Smith to the position of guidance counselor at Calhoun High School (later named West Ouachita High School) from West Monroe High School.
During her first two school years as a guidance counselor at WOHS [1987-88, 1988-89], her principal, Johnny Hines, gave Ms. Smith "Satisfactory" remarks on his observations and evaluations the Board required. During the 1989-90 school year Principal Hines, on March 14, 1990, gave Ms. Smith a "grade" of "Needs Improvement" in four categories on his formal observation. Two months later, however, Principal Hines evaluated and graded Ms. Smith as "Satisfactory" in all categories.
Because Ms. Smith had been given the "Needs Improvement" ratings in the March 1990 observation, Hines was required to place Ms. Smith in a "Professional Assistance Program," near the end of that school year on May 28, 1990.
After the beginning of the 1990-1991 school year and apparently not recognizing the significance of the legislature's amendment of La. R.S. 17:444(B) in 1985, Hines became concerned that Smith might gain "tenure" as a guidance counselor. That amendment precluded such a possibility. Hines then met with Ouachita Parish School Superintendent Dr. Neal Lane Johnson to discuss his concerns and to recommend that Ms. Smith be transferred elsewhere.
In his letter of September 27, 1990, Dr. Johnson informed Ms. Smith that upon Principal Hines's recommendation, she was being removed from WOHS and was to report to WMHS to set up a program teaching business skills to students with particular needs. Ms. Smith promptly responded by letter to Principal Hines invoking the grievance procedure adopted by the Board. Hines then responded that he would not reconsider his recommendation. On October 5, 1990, Smith formally wrote to Dr. Johnson to "appeal" his decision of September 27. On October 9, 1990, the Board voted to approve or ratify Ms. Smith's transfer to West Monroe. By letter of October 9, 1990, Dr. Johnson informed her that the original decision would stand.
Because the Board and Dr. Johnson had formally "acted" on Ms. Smith's objection or appeal to them of her transfer a month or so after the 1990-91 school year began, no appropriate business course position was then available at WMHS for Ms. Smith. The WMHS principal assigned Ms. Smith in October 1990 to teach or serve in special education at WMHS, an area in which she was not trained. She spent the remainder of the *730 fall semester, 1990, in that assignment. At the beginning of the second semester early in 1991, Ms. Smith was temporarily assigned to teach four business English classes and one English class. This assignment endured for about a week because the regularly assigned teacher returned to her position and students apparently voiced their preference for another teacher. Ms. Smith was then moved to the Professional Development Center, where she was assigned to help physically disabled students adapt to a workplace environment. Smith accompanied a student with cerebral palsy named "Wendy," who, under Ms. Smith's supervision, performed menial tasks for State Farm Insurance and a cricket farm.
On May 13, 1991, Smith admitted herself into Charter Hospital in Jackson, Mississippi for treatment of depression, discharging herself on May 22, 1991, as she said, to care for her family. Smith then returned to the Professional Development Center to finish the semester. In the 1991-92 school year, Ms. Smith was assigned and taught business classes at WMHS. Ms. Smith requested and obtained a sabbatical leave during the fall semester of 1992, returning to teach the spring semester of 1993. Ms. Smith moved to Dallas during the next school year (1993-94) and eventually became head counselor at a Dallas-area high school.
In Ms. Smith's action, filed August 13, 1991 and tried on four days in April 1995, the trial court awarded her $25,000 in general damages, $19,440 in attorney's fees, $11,854 in medical expenses, $2,587 in lost wages and benefits, and $1,050 in medical deposition costs.
We shall address the Board's arguments that: (i) La. R.S. 17:444 does not apply to Ms. Smith's 1987 transfer to the guidance counselor position; (ii) Smith's due process rights were not violated; (iii) La. R.S. 17:391.5 applies to this case, and its provisions were substantially met; (iv) the Board did not intentionally inflict emotional distress upon Smith; (v) if any damages are due, Smith is entitled only to three, and not to four, weeks of lost wages and benefits; (vi) if any attorney's fees are due, then the amount awarded is excessive; and (vii) medical expenses and costs of the medical depositions should not be assessed against the Board because it was not proven that the medical expenses were the result of the Board's actions.

DISCUSSION

R.S. 17:444 Promotion
The trial court found that the 1987 transfer of Ms. Smith from a teaching position at WMHS to a guidance counselor position at Calhoun (WOHS) was a promotion under La. R.S. 17:444 of the Teacher Tenure Law, La. R.S. 17:441-446. Enacted to protect educators from political reprisals, the tenure law is to be liberally construed in a teacher's favor. Rousselle v. Plaquemines Parish School Board, 93-1916 (La.2/28/94), 633 So.2d 1235, 1241.
La. R.S. 17:444 initially provided that teachers could acquire tenure in their promoted positions. However, in response to the disappearance of promotional positions as a result of the actual elimination of the position or the closing of schools for economic reasons, La. R.S. 17:444 was amended in 1985 by the addition of Subsection B. Rousselle at 1242. As a result of the 1985 amendment, teachers promoted to positions of higher salary after August 1, 1985 cannot become tenured in the promoted position. See Rousselle, supra. In 1987, the law provided in pertinent part:
§ 444. Promotions to and employment into positions of higher salary and tenure
* * * * * *
B. (1) Whenever a teacher who has acquired permanent status, as set forth in R.S. 17:442, in a parish or city school system is promoted by the employing school board by moving such teacher from a position of lower salary to one of higher salary, such teacher shall not gain permanent status in the position to which he is promoted, but shall retain permanent status acquired as a teacher, pursuant to R.S. 17:442.
(2) Where a teacher has not completed the probationary period for teachers as required by R.S. 17:442, and is promoted to a higher position, the probationary period *731 as a teacher shall continue to run and at the end of such three year probationary period the teacher shall automatically acquire permanent status in the previously held position of teacher.
(3) The employment provided for in this Section shall be for a term of not less than two nor more than four years, and said term shall be specified in a written contract, which shall contain performance objectives. The board and the employee may enter into subsequent contracts for such employment. Not less than sixty days prior to the termination of such a contract, the superintendent shall notify the employee of termination of employment under such contract, or in lieu thereof the board and the employee may negotiate and enter into a contract for subsequent employment....
La. R.S. 17:444, as amended by Acts 1985, No. 988.
As a tenured teacher, Ms. Smith's 1987 assignment as a guidance counselor should be considered under Subsection B(1). Subsection B(2) applies to probationary teachers. The issue then becomes whether Ms. Smith's assignment is a promotion to a "higher position" or to a position of "higher salary." In our opinion, the trial court correctly reasoned that the statute uses the terms "higher position" and "higher salary" interchangeably. Pasqua v. Lafourche Parish School Board, 408 So.2d 438 (La.App. 1st Cir.1981).
The Pasqua court generally concluded that La. R.S. 17:444 [now subsection A] used the terms "lower position" and "higher position" in reference to salary. Pasqua read the "moving such teacher from a position of lower salary to one of higher salary" language of A(1) in conjunction with the "higher position" language used in A(2). The language the Pasqua court focused on in A(1) appears verbatim in the amended subsection B(1). While the language examined in A(2) is not identical to the language of the amended B(2), there is a reference to "higher position" in B(2). Expanding the meaning of "salary" in B(1) to include "position" is also consistent with the principle of liberal construction of the Tenure Law in favor of teachers.
If we should limit the application of the statute exclusively to a situation where a tenured teacher is promoted to a position of "higher salary," as the Board suggests, we would reach the absurd result that a probationary teacher, but not a tenured teacher, would be able to claim benefit of the statute solely by being promoted or assigned to a "higher position," without being given a "higher salary." § 444 B(2) Consequently, we find no error in the trial court's interpreting, in the context of this record, that the term "higher salary" as used in La. R.S. 17:444 B(1) is synonymous with the term "higher position." La. R.S. 1:3-4.
The position of guidance counselor has been found to be a "higher" position than that of a teacher. Pardue v. Livingston Parish School Board, 251 So.2d 833 (La.App. 1st Cir.1971). There the court held that moving a guidance counselor to a position teaching English was a demotion, reasoning that the position of guidance counselor has a higher professional standing because guidance counselors have greater minimum education requirements.
Here the trial court emphasized the testimony of Dr. Frank Hoffman, personnel director for Ouachita Parish schools. Dr. Hoffman conceded that while a counselor is not considered to be an administrator, a teacher may consider it desirable to become a guidance counselor, with the required special certification. In that context the conclusion is not clearly wrong that Smith was promoted to a higher position when she was assigned to the position of guidance counselor in 1987.
Likewise, the conclusion is not clearly wrong that Smith was paid a "higher salary" in the position of guidance counselor. The term "salary" has been broadly interpreted to include on-campus housing and free meals. Pizzolato v. State Through Board of Elementary and Secondary Education, 452 So.2d 264 (La.App. 1st Cir.1984). Guidance counselors in the Ouachita Parish school system are paid more on an annual basis than teachers with the same level of education and years of experience. The Board attempts to explain that the difference in annual pay results from guidance counselors being required *732 to work an additional two weeks per year, while the basis of the annual pay of each position is the same. The Pardue finding that an English teacher and a guidance counselor received the same salary despite the counselor receiving additional compensation for extra work was based on the reasoning that Livingston Parish counselors and teachers each received the same pay from local and state sources, while compensation for the additional work performed by Livingston Parish guidance counselors came from a federally-funded program.
School systems routinely compensate personnel in non-teaching positions for additional work by using a statutory formula that involves multiplying a teacher's salary by a particular index. For example, La. R.S. 17:421.5 sets forth the minimum salaries for superintendents, principals, assistant principals, and other certified or licensed school personnel. The statute provides that if these employees receive a salary provided through the minimum foundation program formula, then they "shall receive a minimum salary equal to an additional one-ninth for each additional month employed beyond nine based on the salary he would receive as a teacher paid under the provisions of the minimum salary schedule for teachers." Other courts have disregarded whether the base salary of a teacher is a critical factor in determining if a salary in one position is higher or lower than that of another position. The Pasqua court, for example, found that there was a transfer to a position of lower salary because the salary received by an assistant principal at a junior high school was calculated by multiplying a teacher's salary by an index of 1.21, while an index of 1.16 was used for assistant principals at elementary schools.
Similarly, in Brooks v. Orleans Parish School Board, 550 So.2d 1267 (La.App. 4th Cir.1989), writ denied, Brooks v. Orleans Parish School Board, 553 So.2d 466 (La. 1989), the court concluded that Basic Skills Strategists transferred to the position of Basic Skills Specialist were paid a lesser salary because they now worked four fewer weeks per year, even though they received the same base pay and pay supplement. Here Ms. Smith received a higher salary as guidance counselor than as a teacher because she received more on an annual basis than if she had remained a teacher. The mere fact that the basic salary rate for a teacher was used as a factor in calculating the salary for a guidance counselor is of no legal significance.

Written Contract
Having concluded Ms. Smith was promoted within the context of La. R.S. 17:444, we agree with the trial court that the Board failed to contract with her and to set forth performance standards for her position in writing as required by Subsection B(3). This provision required a written contract for a term of not less than two nor more than four years, and allows subsequent contracts to be negotiated.
The trial court assumed that Ms. Smith would have received an initial contract (1987-88, 1988-89) of at least two years, the statutory minimum. This initial contract would have ended before the 1989-90 contract began. Principal Hines testified that as late as September 7, 1990, he planned to keep Ms. Smith as a guidance counselor. We note that Ms. Smith had received satisfactory evaluations from Principal Hines during her first two years as guidance counselor. This record allows the conclusion that Ms. Smith would have been offered and would have accepted a new contract at the end of the 1988-89 school year for a term of at least the minimum two years (or perhaps three years, the midpoint between the minimum and the four-year maximum, as reasoned by the trial court). The trial court acknowledged that it was speculating on the term because of the absence of evidence of the Board's actual practice of contracting in writing as the statute requires.
In Burns v. Monroe City School Board, 577 So.2d 1205 (La.App. 2d Cir.1991), writ denied, Burns v. Monroe City Board, 581 So.2d 683 (La. 1991), writ denied, Burns v. Monroe City School Board, 581 So.2d 686 (La. 1991), this court found that a supervisor was entitled to remain in her position for an additional two years because of the "reconduction" of her original contract which was for a two-year term. Here there is no such original contract to "guide" us or the trial *733 court. Here the trial court could only assume that plaintiff's initial contract would have been for the minimum two years.
A new, renewal, or second contract, of course, would have been for two to four years as the statute mandates. Because Ms. Smith served as a guidance counselor during the school years 1987-88, 1988-89 and 1989-90, she was in her third year when her next to last observation in March 1990 by Principal Hines was "Needs Improvement." When "removed" by the Board in October 1990, Ms. Smith would have then been working under a second contract. The trial court reasoned that the second contract would have likely been for a mid-range three years (1989, 1990 and 1991 school years). A second contract of whatever duration (two to four years) began in 1989. This second contract in effect in October 1990 could only have been terminated in compliance with La. R.S. 17:444.
A second contract beginning in the 1989 school year would have been subject to amendments of La. R.S. 17:444, which in Subsection B(3)(c) provide that:
The board and the employee may enter into subsequent contracts for such employment. Not less than sixty days prior to the termination of such a contract, the superintendent shall notify the employee of termination of employment under such contract, or in lieu thereof the board and the employee may negotiate and enter into a contract for subsequent employment. If any person so employed shall be found incompetent or inefficient or shall fail to fulfill the terms and performance objectives of his contract during the term of his employment, he shall be removable for such cause by the board; provided, however, that any person so removed shall have the right to written charges, notice of hearings, and a fair hearing before the board. If the person so removed had previously acquired regular and permanent status as a teacher, he shall retain the permanent status previously acquired as a teacher; and should he be removed by the board from his position in the manner hereinabove set forth, or should his contract not be renewed, he shall be returned to his former position as a teacher, or one paying the same salary as his former position as a teacher.
La. R.S. 17:444, as amended by Acts 1988, Nos. 228 and 900. Our emphasis.
We determine that the failure of the Board to prepare and execute a written contract with Ms. Smith for at least the required minimum term (two years 1987-88 and 1988-89 and two years 1989-90 and 1990-91) should not deprive Ms. Smith of the protection of La. R.S. 17:444 B(3)(c) that she be "removable for cause" and in the "manner" emphasized in the statute.
Ms. Smith had no "terms and performance objectives" set forth in a written contract as contemplated by the statute. Ms. Smith attempted, without success, to invoke the Board's grievance procedure by complaining to Principal Hines and "appealing" to Superintendent Johnson. On October 9, 1990, the Board "approved" the transfer of which she earlier complained before she could exercise her right to a hearing before the Board. A hearing by the Board after the Board approves an action or transfer runs contrary to the pronounced principle that "the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before the [action] takes effect." Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Our brackets and emphasis.
Under the circumstances of this record, we must agree with the trial court that even if Ms. Smith should have pursued a Board hearing after October 9, 1990, the Board still lacked cause for her removal because the Board did not obtain a written contract obligating her to specific "performance objectives" or remove her in the "manner" the statute directs. § 444 B(3).
The Board argues that it was sufficient that it substantially complied with the grievance procedures outlined in its "Personnel Accountability Plan," citing McKenzie v. Webster Parish School Board, 26,713 (La. App.2d Cir. 4/5/95), 653 So.2d 215. In McKenzie, the only procedures that the school board failed to strictly comply with when not renewing a probationary teacher's contract concerned the use of a particular *734 professional assistance form and a deadline for improvement. McKenzie concerned whether the Webster school board complied with its system of evaluation required by La.R.S. 17:391.5. Here the concern is whether the Ouachita school board complied with the Teacher Tenure Law.[1]
The Board mistakenly attempts to rely upon substantial compliance with its grievance procedure to circumvent the mandate of La. R.S. 17:444. La. R.S. 17:444 required a hearing before the board, while the fourth level in the grievance procedure gives the school board discretion whether to hold a hearing.[2] La. R.S. 17:444 required the Board to follow the statutory mandates before it approved Ms. Smith's transfer from her guidance counselor position. We must agree with the trial court that the Board wrongly demoted Ms. Smith, contrary to La. R.S. 17:444.

Due Process
Because Ms. Smith's statutory rights were violated does not automatically mean that her constitutional rights were likewise violated. See Franceski v. Plaquemines Parish School Board, 772 F.2d 197, 200 (5th Cir.1985). Ms. Smith must prove that she possessed a property interest in the guidance counselor position as a predicate to a due process claim. A property interest in government employment may arise from state law or out of contract. See Cabrol v. Town of Youngsville, 106 F.3d 101, 105 (5th Cir.1997). La.R.S. 17:444's requirement that the Board employ Ms. Smith by a written contract of at least two years vests Ms. Smith with the required property interest. We recognize Ms. Smith had no expectation of continued or indefinite employment as a guidance counselor, but only a "property interest" during the term of the written contract(s) the statute required.
The essential requirement of due process is that a deprivation of property must be preceded by notice and opportunity for a hearing. Loudermill, supra. Thus, due process required that the hearing provided in La. R.S. 17:444 B(3)(c) occur before the Board could demote or transfer Ms. Smith for cause. The Board approved Ms. Smith's transfer-demotion on October 9, 1990, after her objections to her principal and the superintendent were made in an attempt to invoke the grievance procedure. Again we agree with the trial court: Ms. Smith was not afforded due process when she was demoted and transferred without the benefit of notice and hearing as required by the statute.
Ms. Smith's cause of action lies under 42 U.S.C. § 1983, which reads in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or, causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.
We cannot agree with the Board's argument that it is not liable under § 1983 because it did not violate Smith's constitutional rights.

Intentional Infliction of Emotional Distress
The elements for a claim of intentional infliction of emotional distress were set forth in White v. Monsanto Co., 585 So.2d 1205 (La.1991). Ms. Smith must prove that the conduct of the Board was extreme and outrageous, that the emotional distress she suffered was severe, and that the Board desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from *735 its conduct. Conduct is considered extreme and outrageous when it goes beyond all possible bounds of decency and is regarded as being atrocious and utterly intolerable in a civilized community. White at 1209.
The trial court found that three acts by the Board were sufficient to meet the requirements stated in White. The first of these acts was Ms. Smith's wrongful demotion and transfer in violation of her due process rights. Taylor v. State, 617 So.2d 1198 (La.App. 3d Cir.1993), writ denied, Taylor v. State, 620 So.2d 875 (La. 1993). Taylor involved a police officer who improperly investigated Taylor in response to a civil action filed against the officer by Taylor. The trooper's abuse of process was found to be extreme and outrageous because he failed to comply with proper procedures and acted for an ulterior purpose. This ulterior purpose is "similar to the concept of `malice,' but is a much more demanding test which would not be met by a showing of lack of knowledge or other technical types of malice, but which is only met when the [defendant] is acting for a specific purpose not authorized by law." Taylor at 1205.
This record does not allow the conclusion that the Board acted with such an ulterior purpose or malicious motive. Indeed, the Board seemed to violate Ms. Smith's due process rights out of ignorance, or lack of knowledge, of the law. Principal Hines was mistakenly concerned in September 1990 that Ms. Smith would acquire tenure as a guidance counselor. Even though we agree that the Board violated Ms. Smith's statutory and due process rights and caused her emotional and psychological distress by demoting her in the manner described, this Board's conduct was neither extreme nor outrageous.
The second act that the trial court found to be an intentional infliction of emotional distress was the placement of Ms. Smith in the special education area at WMHS in October 1990. Ms. Smith was given an assignment of writing a program for special education students, but she stopped working on this when she learned that the program had already been developed. Ms. Smith then spent most of her time sitting in her room writing notes and reading the Bible and the newspaper. Ms. Smith felt as if she was being tortured, and she described herself as feeling depressed, embarrassed and ashamed. Ms. Smith did not voice an objection to being placed there, however, and she knew that this would be a temporary assignment until a proper teaching position became available. Ms. Smith also never complained to anyone about not having anything to do. While Ms. Smith may have subjectively felt humiliated and unproductive, a reasonable person, viewed in hindsight and objectively, who truly wanted to remedy such a situation, would have complained or at least sought more meaningful or additional assignments.
The third act found to constitute intentional infliction of emotional distress was when Ms. Smith was removed from the business English classes in the spring of 1991 and assigned to the Professional Development Center. Ms. Smith was aware at the onset that her assignment to the Professional Development Center would be temporary. Again she did not express opposition or seek more subjectively meaningful assignments when she learned that she would be working with special education students for Betty Gardner, the job placement coordinator. Ms. Smith supervised special education student "Wendy" who removed staples and microfilmed documents at State Farm and placed bait in containers at the cricket farm. Besides working with Wendy, Ms. Smith also assisted Gardner with office duties. Ms. Smith described this as the most humiliating experience. The record shows that many other teachers were doing the same special education work that Ms. Smith was performing, negating any suggestion that Ms. Smith was being "singled out" for intentional punishment.
Hoffman acknowledged that Ms. Smith was placed in jobs that were not the best situation for her. While we agree that the Board may have taken better advantage of Ms. Smith's education and experience, this does not mean that the Board's conduct was extreme and outrageous.
Employers enjoy some reasonable latitude when dealing with employees. Although an *736 employer is in a position to take advantage of his or its authority, "disciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable." White at 1210. Nothing done by the Board after Ms. Smith's demotion can be reasonably characterized as being atrocious, utterly intolerable in a civilized society, or beyond all possible bounds of decency. The Board was simply trying to place Ms. Smith in positions it felt were suitable until Ms. Smith could return to regularly teaching business courses. All teaching positions appropriate for Ms. Smith had been made to others before October 9, 1990, when the Board acted. Ms. Smith was regularly assigned to teach business courses in the next school year.
Conduct in the workplace far more egregious than that experienced by Ms. Smith has been found not to be extreme and outrageous. Because employees are expected to respect the authority of their supervisors, an employee may be entitled to a greater degree of protection from a supervisor than a stranger could expect. White at 1210. White was unable to recover despite suffering an anxiety attack after a supervisor verbally berated her and two other employees for a minute. The same result was reached in another case even though a male supervisor constantly yelled at a female worker, cursed her, called her demeaning names such as "dumb" and "stupid," would go into violent rages, and made disparaging comments about her appearance. See Beaudoin v. Hartford Accident & Indemnity Company, 594 So.2d 1049 (La.App. 3d Cir.1992), writ denied, 598 So.2d 356.
Maggio v. St. Francis Medical Center, Inc., 391 So.2d 948 (La.App. 2d Cir.1980), cited by Ms. Smith, is distinguished because it concerned a summary judgment. There, a nun who was chief administrator at a hospital was accused of demoting plaintiff to a menial position and moving his office to a secluded area, among other allegations. We reversed the summary judgment, because viewing plaintiff's allegations in the light most favorable to him, the allegations met the requirements of an intentional act, an exception to the exclusive remedy under the workman's compensation law. We did not, however, analyze the merits of Maggio's claim against his employer for intentional infliction of emotional distress.
Either viewed in isolation or as a pattern, the acts by the Board which are complained of do not rise to the level of being extreme and outrageous, nor permit the finding that the Board intended to inflict severe emotional distress on Ms. Smith. In order for liability to attach, "conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like." White at 1210; our emphasis. When Ms. Smith testified about how she felt in these various situations, she consistently stated that she felt embarrassed and humiliated. Although the failure to have a musician's symphony contract renewed was embarrassing and humiliating for the musician, a summary judgment was properly granted because these actions fell far short of the requirements for intentional infliction of emotional distress. Kosmala v. Paul, 93-2117 (La.App. 1st Cir. 10/7/94), 644 So.2d 856.
The emotional distress suffered must be to an extent that no reasonable person could be expected to endure it. White at 1210. When Ms. Smith checked into Charter Hospital, her chief complaint was depression. This record shows that Ms. Smith suffered from depression before she was demoted in October 1990. Ms. Smith was examined at Charter Hospital by Dr. George Ladner, a board-qualified psychiatrist. Dr. Ladner did not have any reason to doubt Ms. Smith's belief that job stress was the cause of the major depression that hospitalized her. Dr. Ladner opined that Ms. Smith's depression was caused by a change to something that Ms. Smith did not want to do and her inability to adjust. He also found that Ms. Smith was somewhat schizoid.
Dr. Ladner consulted with Dr. Charlton Stanley, who is board-certified in both counseling psychology and forensic psychology. After performing a battery of tests on Ms. Smith, Dr. Stanley diagnosed Ms. Smith as suffering from major depression that appeared very close to being psychotic depression. *737 While Dr. Stanley did not doubt that the demotion aggravated or made her depression worse, he thought that it was most likely caused by something that took place well before her demotion. Ms. Smith did not seek any out-patient treatment after she left Charter, even though she was aware that it was available.
The Board did not engage in extreme and outrageous conduct, nor did the Board desire to inflict severe emotional distress or know that such distress was certain or substantially certain to result from its actions, even though it "intended" to demote or remove Ms. Smith. Notwithstanding this conclusion, we recognize that recovery for negligent infliction of emotional distress has been allowed in cases involving the "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Moresi v. State Through Dept. of Wildlife and Fisheries, 567 So.2d 1081, 1096 (La.1990). There is a concern that fraudulent claims will arise if liability is imposed for merely negligent conduct that results in mental distress without accompanying physical injury. Cases cited in Moresi that have met these legal criteria have included the performance of an unauthorized autopsy, the accidental burning of a corpse trapped in wreckage, a funeral home unlawfully retaining a body until payment for services, the exposure of remains from a car crashing into a cemetery, and a car hitting a home. The Moresi plaintiffs did not recover because their mental disturbance was not found to be severe. The emotional distress suffered by Ms. Smith, however, can easily be characterized as genuine and serious, requiring hospitalization and treatment. She was ultimately diagnosed as suffering from major depression after enduring the results of the Board's actions for many months.
The basis of liability for negligent infliction of emotional distress in Ms. Smith's circumstances is La. C.C. art. 2315. Whether a defendant's conduct is a cause-in-fact of a plaintiff's injury is the initial inquiry in any negligence action. Weaver v. Valley Elec. Membership Corp., 615 So.2d 1375, 1382 (La.App. 2d Cir.1993). The conduct of the Board was a cause-in-fact of Ms. Smith's depression. If the Board had not wrongfully removed Ms. Smith from her guidance counselor position contrary to the requirements of La. R.S. 17:444 and then placed her in various non-teaching positions, Ms. Smith would not have been humiliated, embarrassed and ashamed to such an extent that she would seek psychiatric help. La. R.S. 17:444 imposed a duty on the Board to employ Ms. Smith by a written contract and to only remove her from her promoted position in accord with that statute. The Board breached this duty by not following the mandates of La. R.S. 17:444 when failing to contract with, and when later demoting, Ms. Smith. The issue then becomes whether the risk of the harm suffered by Ms. Smith was within the scope of protection afforded by the duty that is urged.
When La. R.S. 17:444 was amended in 1985 to prevent the acquisition of tenure in promoted positions, promoted teachers were not entirely stripped of all protection. After 1985, a promoted teacher would not have the protections against removal offered by La. R.S. 17:443 in a promoted position. Instead, the promoted teacher would have contractual rights and obligations (stated terms and objectives), and statutory protection (removal only for cause and with the benefit of notice and a hearing). La. R.S. 17:444 was later amended in 1991 to provide the conditions under which school boards may decline to offer a "new" contract. In doing this, the legislature "returned a semblance of job protection to competent tenured teachers employed under promotional contracts when their promotional jobs continue in existence." Rousselle at 1243.
The motivation behind the enactment of the Teacher Tenure Law was to prevent arbitrary removal of teachers and to require strict adherence with statutory requirements before removal. Such arbitrary removal is capable of being accomplished through indirect as well as direct means, such as by placing a teacher in a position to which he is unaccustomed. State ex rel. Bass v. Vernon Parish School Board, 194 So. 74 (La.App. 1st Cir.1940).
*738 The trial court suspected that the conduct of the Board may have been evidence of an intent to encourage Ms. Smith's premature departure from the Ouachita Parish school system. Ms. Smith was twice placed in situations for which she had no experience, and both times she was isolated from the center of academic activity. She perceived that she became a sort of curiosity at WMHS, believing that other teachers wanted to see the teacher who was paid to do nothing. She was ordered to accompany a handicapped student and watch that student perform monotonous tasks. This conduct by the Board falls within the arbitrary treatment of a promoted teacher that La. R.S. 17:444 condemns.
The Board argues that it was unable to place Ms. Smith in an appropriate teaching position because she was demoted after the beginning of the 1990-91 school year. The timing of Ms. Smith's demotion was chosen by the Board. In any event, Ms. Smith was given an appropriate, but temporary, teaching assignment at the beginning of the Spring semester of 1991. We can agree that Ms. Smith's employment conditions after her October 1990 demotion placed great stress on her already fragile psyche. She avoided social contact as result of the embarrassment that she felt. She began to have headaches, had trouble sleeping and became forgetful. The quality of life for her two young daughters suffered as Ms. Smith's depression caused her to neglect them. She wisely sought professional help.

Damages, Attorney Fees
Ms. Smith continued working for the Board for two years after she was removed from the guidance counselor position. Ms. Smith was transferred in October 1990 after school began. Whether she was paid for the first extra week she worked in the 1990-1991 school year is not established one way or the other in this record. The trial court based its lost wages award on four weeks, at $646.89 per week. The Board alternatively contends that if Ms. Smith is entitled to recover lost wages, she should recover only three weeks wages, arguing that she was paid for the first week before school began in 1990. The payroll record in this case is not for the 1990-91 school year, but the 1989-90 school year. No witness testified that she was paid for the first week in the 1990-91 school year. Under these circumstances, we cannot find the trial court clearly wrong in this respect.
Ms. Smith is entitled to recover reasonable attorney's fees under 42 U.S.C. § 1988. The Board contends that the award of $19,440.00 in attorney's fees is excessive. An award of attorney's fees pursuant to 42 U.S.C. § 1988 is only to be disturbed upon a showing of abuse of discretion. Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish School Board, 919 F.2d 374 (5th Cir.1990). The Board does not dispute the number of hours Ms. Smith's counsel worked on the case. Instead, the Board argues that the hourly rate of $135 approved by the court is excessive, especially in light of the fact that Ms. Smith had a contingency fee contract with her attorney. While the existence of a contingency fee contract is a factor in determining the reasonableness of an award, the mere fact that there is one does not impose a ceiling or cap on the amount of fees awarded. Blanchard v. Bergeron, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). We find no abuse of the trial court's discretion in the attorney's fee award.
In awarding $25,000 in general damages, the trial court made one award for all causes of action that had merit, rather than an amount for each theory of recovery.[3] The trial court cited Easterling v. Monroe City School Board, 27,795 (La.App.2d Cir. 1/24/96), 666 So.2d 1279, to support its award. Easterling was awarded $31,250 in damages after the defendants were found guilty of negligence and intentional infliction of emotional *739 distress. Taylor, supra, was also cited by the trial court. Like Easterling, Taylor was successful in asserting her claim of intentional infliction of emotional distress, but her $500,000 award for past, present, and future anxiety and distress was reduced to $40,000.
An award of $15,000 was made to the driver and each passenger for negligent infliction of emotional distress suffered as a result of an automobile accident in Doucet v. Champagne, 94-1631 (La.App. 1st Cir. 4/7/95), 657 So.2d 92.[4] In French v. Ochsner Clinic, 200 So.2d 371 (La.App. 4th Cir.1967), $1,500 was awarded to a widow after an unauthorized autopsy was performed on her husband. One thing apparent about the above-cited cases and other cases involving this sort of claim is that in most cases the actionable conduct was but a single incident, or at best it occurred over a short-span of time. The same is not true with regards to Ms. Smith as she remained in these positions from early October to the middle of May, when she sought treatment. Thus, for seven months Smith was placed in situations that exacerbated her distress.
Whether intentionally or unintentionally inflicted, the duration of the emotional distress of Ms. Smith warrants a fair and just award. While we do not increase the award as urged by appellee, we cannot say that the trial court abused its discretion in awarding $25,000 general damages.

DECREE
At the cost of the Board, the judgment is AFFIRMED.
NOTES
[1] In Gaulden v. Lincoln Parish School Board, 554 So.2d 152 (La.App. 2d Cir.1989), writ denied, Gaulden v. Lincoln Parish School Board, 559 So.2d 126 (La.1990), the court held that when a teacher's competency is at issue, La. R.S. 17:391.5 needs to be complied with before dismissal proceedings begin under La.R.S. 17:442.
[2] Fourth level: If the grievance is not resolved, the grievant may, no later than five (5) school days after receipt of the Superintendent's decision, request a review by the Board ... The Board shall review the grievance and shall, at the option of the Board, hold a hearing with the grievant ... If the Board decides not to hold a hearing ... Compare § 444 B(3) quoted above.
[3] Compensatory damages including general damages for emotional and mental distress are recoverable under § 1983. Varnado v. Department of Employment and Training, 95-0787 (La. App. 1st Cir. 6/28/96), 687 So.2d 1013. Varnado, an administrative hearing officer, and his secretary were awarded $90,000 and $60,000 respectively for lost wages, pain and suffering, and emotional and mental distress. After being terminated, the plaintiffs filed a § 1983 action based on unconstitutional searches of their offices.
[4] Other awards in Doucet included: $2,000,000 to one passenger for future medical expenses, $110,000 and $260,000 in loss of earning capacity to the two passengers, $300,000 to driver for past and future pain, suffering, and mental anguish, and $1,500,000 to one passenger for past and future pain, suffering, and mental anguish.