657 So.2d 92 (1995)
Paul DOUCET, Russell Doucet and Michael Doucet
v.
Herbert J. CHAMPAGNE, Jr., ABC Insurance Company and State of Louisiana, Through the Department of Transportation and Development.
No. 94 CA 1631.
Court of Appeal of Louisiana, First Circuit.
April 7, 1995.
Opinion Granting Rehearing in Part June 21, 1995.
*93 Douglas M. Schmidt, Peter Borstell, Wayne E. Garrett, New Orleans, for Paul Doucet, Russell Doucet, Michael Doucet, and Debra Doucet.
Stephen J. Caire, Sp. Asst. Atty. Gen., Gretna, for State of La., Dept. of Transp. and Development.
Nancy L. Yeager, Covington, for Herbert J. Champagne, Jr.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
LOTTINGER, Chief Judge.
This action arises out of an automobile accident which occurred in February of 1992, on the U.S. Highway 11 bridge spanning Lake Pontchartrain from Slidell to New Orleans. Following trial on the merits, the trial judge assigned 0% fault to the Department of Transportation and Development (DOTD) and 100% fault to defendant, Herbert Champagne, Jr. From this judgment, the plaintiffs and Champagne appeal.

FACTS
Defendant, Champagne, was traveling north on the Highway 11 drawbridge in a heavy downpour. As he approached the metal grating on the north draw, his vehicle veered into the oncoming traffic where it struck a pickup truck owned and operated by Paul Doucet. Mr. Doucet's two sons, Russell and Michael, were passengers in the truck. The Doucets filed suit against Champagne for negligence in crossing lanes and against the DOTD for failing to properly maintain, inspect and/or take remedial action in the face of notice of a high incidence of accidents *94 on the bridge. Champagne filed a cross-claim against the DOTD.
At trial, the Doucets attempted to prove, through expert testimony, that the condition of the bridge caused the accident. The DOTD presented conflicting expert testimony proving that no element of the bridge, in whole or in part, caused the accident. Following trial, the trial judge stated in his reasons for judgment that, "[t]his case must be decided on the testimony and the credibility afforded the expert witnesses___ I find the basis for the conclusions reached by the State's experts to be sound technically and well grounded in common sense." The trial judge concluded that whatever deficiencies the bridge may have had, these deficiencies were not the cause-in-fact of the accident. The trial judge then concluded that Champagne's negligence was the sole cause of the accident. From this judgment, the Doucets and Champagne appeal. Their assignments of error raise the following issues for review: whether the trial judge erred in: (1) accepting the DOTD's experts' testimony; (2) excluding materials pursuant to 23 U.S.C. § 409; (3) concluding that Champagne was inattentive; and (4) assessing damages.

EXPERT TESTIMONY AND APPLICATION OF 23 U.S.C. § 409
At trial, the DOTD and the Doucets each presented expert witnesses to support their contentions. The Doucets' experts concluded that the defective condition of the bridge caused Champagne's vehicle to veer into the oncoming lane. The conditions noted by these experts included missing sections of the metal grate, uneven leaves of the metal draw[1], worn metal grating[2], a low coefficient of friction, and rutted and patchy asphalt which allowed standing water.
On the other hand, the DOTD's experts concluded that there was no condition of the bridge, either in isolation or in combination, which caused the accident. These experts contended that the coefficient of friction on the bridge was not significantly low, that the metal surface was not worn smooth and that there was no misalignment of the draw.
To support their experts' testimony, the Doucets attempted to introduce into evidence individual accident reports, bridge tender reports, damage reports, complaint records and DOTD's computerized "accident locator data" to show that the DOTD had knowledge of the hazardous conditions of the bridge. The trial judge excluded this evidence and accepted the opinions of the DOTD experts, who attributed the cause of the accident solely to driver error. Accordingly, the trial judge found that the condition of the bridge was not a cause in fact of the accident and that the sole cause of the accident was the negligence of Champagne.
The Doucets contend that evidence was erroneously excluded and had the trial judge examined the excluded evidence, he may have reconsidered the explanations offered by the DOTD experts. According to the Doucets, the excluded evidence proves that the high number of accidents occurring on the bridge, particularly in wet weather, gave the DOTD notice of the dangerous situation which should have been corrected.
Generally, where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1111 (La.1990). Credibility determinations are subject to the strictest deference and the manifest error-clearly wrong standard demands great deference for the trier of fact's findings. Lirette v. State Farm Insurance Company, 563 So.2d 850, 852 (La. 1990); Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 883 (La.1993).
*95 However, when factual findings are tainted by a trial judge's erroneous exclusion of evidence, the verdict is not entitled to the appellate court's deference under a clearly wrong or manifestly erroneous standard. Buckbee v. United Gas Pipe Line Company Inc., 561 So.2d 76, 86 (La.1990). When prejudicial error has been committed in excluding evidence, the verdict must be set aside and, under the authority granted in Louisiana Constitution Art. V, § 10(B), the appellate court must make an independent review of the record and decide the case on the merits, giving no weight to the factfinder's conclusions. Id. at 86-87. Error is prejudicial when it consists of the exclusion of evidence related to a material point in issue and adversely affects the substantial rights of the party opposed to the exclusion. Id. at 85.
In the present case, the trial judge excluded the evidence pursuant to 23 U.S.C. § 409, which provides:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144 and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.
The Louisiana Supreme Court addressed the application of section 409 in Wiedeman v. Dixie Electric Membership Corporation, 93-1314, 93-1318, 93-1352 (La. 11/29/93); 627 So.2d 170, cert. denied, ___ U.S. ___, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994). The court noted that section 409 protects documents involving actual construction projects as well as documents compiled pursuant to sections 130, 144 and 152 of title 23. Id. at 172. The court went on to discuss the exclusions under sections 130, 144 and 152:
23 U.S.C. § 130 requires that participating states "conduct a survey of all highways" to identify hazardous railroad crossings, and "establish and implement a schedule" of corrective projects. 23 U.S.C. § 144 requires that states "make application to the Secretary for assistance in replacing or rehabilitating ... highway bridge[s]" which are eligible for aid under a priority system established in cooperation with the Secretary.
Section 152, relative to highway improvements, requires that participating states "maintain an engineering survey ... assign priorities ... and implement a schedule of projects." It mandates "an evaluation process ... which shall develop cost-benefit data." Finally, states must "report to the Secretary of Transportation" on an annual basis. 23 U.S.C. § 152 (emphasis added). Section 409 incorporates § 152 (by reference) and protects the compiled documents from use in civil trials. Beecher [v. Keel ], 607 So.2d at 549 [(La. 1992)]. Thus, in addition to determining whether an item of evidence was compiled "for the purpose of developing any highway safety improvement project," the trial court must decide whether the item is one of those enumerated in § 152.
Id. at 172-73.
The court then stated that "[s]ection 409 creates a privilege for compilations enumerated in the statute, but the privilege does not extend to reports and data gathered for or incorporated into such compilations." Id. at 173. Accordingly, the court concluded that accident reports, traffic counts and other raw data collected by the DOTD were discoverable and admissible. But, surveys to identify and improve hazardous railroad crossings, applications for federal assistance in replacing or rehabilitating bridges, studies assigning priorities and scheduling improvements, and other compilations made for developing highway safety projects which utilize federal funds were excluded under section 409. Id.
Applying Wiedeman to the present case, we conclude that the trial judge erred in excluding some of the evidence. According to Wiedeman, the individual accident reports[3], *96 bridge tenders' reports, damage reports and complaint records were admissible. However, the DOTD's computerized "accident locator data" which compiles accident data milepost by milepost, was properly excluded because this data was developed for use in highway safety projects.
The excluded evidence may have significantly influenced the trial judge's conclusions regarding the cause of the accident. Because the excluded evidence relates to a central issue which adversely affects the substantial rights of the Doucets, we must disregard the trial judge's verdict and review the record de novo. Buckbee, 561 So.2d at 85.
In conducting our review of the record, we considered the expert testimony as well as the improperly excluded evidence. The individual accident reports from 1982 to 1989 indicate that of the accidents occurring on the metal grate, over 75% occurred in wet weather.[4] This high incidence of wet weather accidents supports the theories offered by the Doucet experts rather than the DOTD experts.
Another essential document excluded by the trial judge, was a May 13, 1986 letter from bridge tender Alex Kinchen. This letter was contained in the excluded damage reports and complaint records. In the handwritten letter, Kinchen states that, "Evertime [sic] it raines [sic] someone is spinning around on the bridge northbound usually they keep going." This letter supports the Doucets' contention that the number of wet weather accidents on the grate is even higher than the number indicated in the individual accident reports. A third document, also contained in the excluded damage reports and complaint records, is a May 11, 1992 inventory of steel grate compiled by Dennis Burke, a DOTD district bridge maintenance engineer. The inventory reflects the various types of unused steel grate available in Burke's district. On May 14, 1992, Burke made the following notation on the inventory sheet, "this is the pattern [of metal grate] on N & S draw @ US 11. FAPP [for all practical purposes] projections are gone." The note refers to the 5/16 inch projections which protrude slightly above the plane of the metal sheet. The notation clearly supports the contention of the Doucet experts who stated that the metal grate on the Highway 11 bridge was worn smooth. On the other hand, the note directly contradicts statements made by the DOTD experts. One DOTD expert stated that the "traction lugs" still existed on the grate. Although a second expert stated that there was some "polishing" of the grid, he later suggested that the projection points never existed and, therefore, could not be missing. By admission of DOTD's own maintenance engineer, the projection points had existed but were worn smooth.
These documents, which were not considered by the trial judge, directly contradict the testimony and conclusions of the DOTD experts. The excluded evidence supports the Doucets' contention that the worn metal grating, which becomes especially slick during wet weather, caused Champagne's vehicle to "track" into the oncoming lane.
For these reasons, we find that the DOTD had notice of the defective condition of the bridge[5] and that it failed to make the *97 necessary repairs to correct the defect.[6] Furthermore, we conclude that the defective condition of the bridge was a cause-in-fact of the accident.

FAULT OF CHAMPAGNE
In attributing the sole cause of the accident to Champagne, the trial judge accepted the DOTD's experts' opinions that the bridge was not defective and that the accident could only be caused by Champagne's inattention. Because we have determined that the trial judge erred in accepting the opinions of the DOTD experts, we now review the judge's conclusions regarding Champagne's negligence.[7]
Champagne testified that it was raining at the time of the accident and that he had turned on his headlights, wipers and defogger. He stated that he was traveling 35 mph, the advisory speed posted by the DOTD on the bridge. He stated that when he hit the north draw his vehicle began "tracking" into the oncoming lane. He attempted to steer back into his lane but the vehicle did not respond. Champagne further stated that as a weekend race car driver, he has experienced numerous spins, skids and slides on the race track but, with quick reaction, he can get his race car back in control. He stated, however, that what he experienced on the bridge was not a sliding sensation but was a "tracking" which caused the car to go directly into the oncoming lane.
Albert Smith, the state trooper who investigated the accident stated that "[a]t the time of the accident the roadway was wet, which made the grid itself very slippery, which I think had a major factor in the accident itself." He estimated that at the time of the accident the vehicles were traveling at 45 mph.
The DOTD experts testified that the condition of the bridge was not a cause of the accident and, therefore, the most "probable cause" of the accident was the inattention of Champagne. However, on cross-examination of Champagne, the DOTD did not direct any questions to Champagne's possible lack of attention. Furthermore, the DOTD did not submit any evidence which points to Champagne's driving in an inattentive or reckless manner.[8] Upon concluding that the bridge was not defective, the experts merely attributed the cause of the accident to Champagne's inattentiveness.
Contrary to the assertions of the DOTD experts, we have concluded that the condition of the bridge was a cause in fact of the accident. Because there is no evidence that Champagne was in fact driving in an inattentive or reckless manner, we cannot agree that he was a cause of the accident. According to his testimony, he was traveling at the advisory speed, with headlights, wipers and defogger on, when his vehicle suddenly began tracking into the oncoming lane. All attempts to correct this tracking failed. In light of Champagne's testimony, the testimony of the Doucet experts and the documentary evidence, we conclude that the sole cause of the accident was the defective condition of the bridge.
For the forgoing reasons, we reverse that portion of the judgment attributing the sole cause of the accident to Champagne. We *98 conclude that the sole cause of the accident was the defective condition of the Highway 11 bridge.

DAMAGES
Finally, the Doucets assert that the trial judge erred in assessing low general damage awards. In Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La. 7/5/94); 639 So.2d 216, the Louisiana Supreme Court addressed the proper standard of appellate review for factual findings. The court first cited its prior opinion in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), wherein it stated that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Id. at 1333.
The Ambrose court then noted that the principle set down in Arceneaux was perpetuated in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) and Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). In Youn, a case involving the review of damages, the supreme court stated that "the discretion vested in the trier of fact is `great,' and even vast." Youn, 623 So.2d at 1261. In Stobart, the supreme court stated that a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,'" and "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 882-83.
After citing Youn and Stobart, the Ambrose court stated that:
Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State, Through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support.
Ambrose, 639 So.2d at 221. (Footnotes omitted.)
Following the mandate of the supreme court, we have thoroughly reviewed the facts in this case and have determined that the trial judge was not clearly wrong or manifestly erroneous in granting damages for past and future pain, suffering and mental anguish[9], negligent infliction of emotional distress[10] or loss of consortium.[11] With regard to the awards for loss of earning capacity, the appellate record does not contain the economic testimony referred to in plaintiff's brief, therefore, we cannot say that the trial *99 court erred in granting these awards. Willis v. Letulle, 597 So.2d 456, 475 (La.App. 1st Cir.1992); Adams v. State, Department of Transportation and Development, 464 So.2d 1003, 1004 (La.App. 1st Cir.1985).
The Doucets also challenge the trial judge's awards for future medical expenses for Paul and Russell. While the record does support an award for future medical expenses for Paul, there is no evidence in the record on appeal establishing the cost of future treatment. However, the record does contain Paul's past medical bills for which he was awarded $44,532.30. These past medical bills may be used to conclude what award for future medical expenses would be supported by the record. Brinson v. Morgan City Housing Authority, 629 So.2d 1214, 1218 (La.App. 1st Cir.1993), writ denied, 635 So.2d 1134 (La.1994). Based on the past medical records, we find that the trial judge's award of $30,000.00 for future medical expenses for Paul Doucet was reasonable.
The appellate record does contain evidence of future medical expenses for Russell.[12] The estimated expenses included costs for one time future medical expenses as well as costs for ongoing medical evaluations, treatments, attendant care and equipment. The one time medical expenses alone were estimated at $151,327.00. The combined costs for ongoing medical evaluations, treatments, attendant care and equipment was estimated at over $2,570,614.00.[13] In awarding Russell only $150,000.00 in future medical expenses, the trial judge apparently failed to consider the estimated costs for ongoing medical evaluations, treatments, care and equipment. We find that the trial judge abused his discretion in granting this award. We conclude that $2,000,000.00 for future medical costs for Russell Doucet is the lowest reasonable amount supported by the record.

CONCLUSION
For the foregoing reasons, we reverse that portion of the judgment assigning sole fault to Herbert Champagne and assign sole fault to the DOTD. We amend the judgment to award Russell Doucet $2,000,000.00 for future medical expenses. All other damage awards are affirmed. Costs of this appeal are assessed against the DOTD in the amount of $3,500.00.
REVERSED IN PART, AMENDED AND AFFIRMED IN PART.
SHORTESS, J., concurs with reasons.
SHORTESS, Judge, concurring.
I do not agree with the majority holding which permits the DOTD spread sheet into evidence (page 96, footnote 3) because DOTD did not appeal and the exclusion of its evidence was not assigned as error; however, in view of all the other evidence in this record, the majority's error is harmless because the spread sheet was cumulative.
I respectfully concur.

ON APPLICATION FOR REHEARING
PER CURIAM.
In our original opinion, we reversed that portion of the trial court's opinion which assigned 100% fault to Herbert J. Champagne, Jr. We concluded that due to the defective condition of the Highway 11 bridge, the DOTD was solely responsible for the accident. On application for rehearing, Mr. Champagne contends that because we determined that he was 0% at fault, he was entitled to damages for the injuries which he suffered as a result of the defective condition of the bridge.
On re-checking the record, we note that Mr. Champagne raised two assignments of error in his appellate brief.[1] While *100 he asserted that the trial court erred in finding the state free from negligence, he did not allege that the trial court erred in failing to grant him damages. Matters neither assigned as error nor argued, or, matters assigned as error but not argued may be considered abandoned. See Uniform Rules Court of Appeal 2-12.4; American Motorist Insurance Company v. American Rent-All, Inc., 617 So.2d 944, 947 (La.App. 5th Cir. 1993); Churchill Farms, Inc. v. Louisiana Tax Commission, 249 So.2d 594, 602 (La. App. 4th Cir.), affirmed, 249 So.2d 923, 259 La. 321 (1971). Because this issue was not raised by Mr. Champagne in his original appeal, we will not now consider it on rehearing.
The Doucets also applied for a rehearing on several damage issues. They contend that Russell, Paul and Michael should be awarded damages for the loss of enjoyment of life and that their awards for loss of earning capacity should be increased. The Doucets also contend that the awards for Paul and Michael's future medical expenses should be increased.
In their appellate brief the Doucets did not address the trial court's failure to award damages for loss of enjoyment of life. Furthermore, in brief the Doucets specifically stated that they did not dispute Michael's award for future medical expenses. Again, we decline to consider on rehearing these issues which were not raised or argued in the original appeal. Id. On appeal, the Doucets did raise the issue of loss of earning capacity. In our original opinion we were unable to say that the trial court erred in granting awards for loss of earning capacity because the record did not contain the relevant economic testimony. In their motion for rehearing, the Doucets note that economist, Dr. Melville Wolfson, was scheduled to testify at trial but, due to a death in his family, his appearance was deferred and his testimony was taken by deposition after trial. The Doucets further note that although the deposition was excluded from the appellate record, it was made available to the trial judge before making his decision.
With the addition of Dr. Wolfson's deposition to the record, we have the economic testimony necessary to review the trial judge's awards for loss of earning capacity. We review these awards in light of the standard of review articulated in our original opinion.
The record clearly supports an award for loss of earning capacity. Upon considering the record, the testimony of Dr. Wolfson and the trial judge's awards for past lost wages, we conclude that the trial judge abused his discretion in granting Paul and Michael's awards for loss of earning capacity.
The trial judge awarded Paul $74,107.00 in past lost wages. This award represents approximately one and one-half years of lost wages. Although Paul has a remaining work expectancy of twenty-three years, the trial judge awarded only $50,000.00 for loss of earning capacity. The lowest award supported by the economic testimony was $110,246.00.
The trial judge awarded Michael $13,612.00 for his one and one-half years of past lost wages. Although Michael has a work expectancy of forty-seven years, the trial judge awarded only $100,000.00 for loss of earning capacity. The lowest award supported by the economic testimony was $261,449.00.
Considering the facts, the economic testimony and the enormous discrepancy in the trial judge's awards for past lost wages and loss of earning capacity, we find that the trial judge abused his discretion in granting Paul and Michael's awards for loss of earning capacity. We conclude that awards of $110,246.00 for Paul and $261,449.00 for Michael are the lowest reasonable amount supported by the record.
In considering the evidence as it relates to Russell, we conclude that the trial judge did not abuse his discretion in granting Russell $230,000.00 for loss of earning capacity. *101 The lowest possible award supported by the economic testimony was $227,422.00. Considering all the evidence, we cannot say the trial judge abused his discretion in granting this award.
The only issue remaining on rehearing is the adequacy of the trial judge's award for Paul's future medical treatment. In our original opinion we used past medical expenses to support the trial judge's award for Paul's future medical expenses. Although Dr. Wolfson's deposition gives an estimate for Paul's future medical expenses we again affirm the trial judge's award. The trial judge was free to conclude, based on the medical testimony, what future treatment Paul requires. Based on the medical evidence in the record, we cannot say that the trial judge was clearly wrong or manifestly erroneous in granting damages for Paul's future medical expenses.
For the forgoing reasons, a rehearing is granted for the purpose of amending our original opinion to increase the award for Paul's loss of earning capacity to $110,246.00, to increase the award for Michael's loss of earning capacity to $261,449.00, to affirm the award for Russell's loss of earning capacity and to affirm the award for Paul's future medical expenses. In all other respects, the applications for rehearing applied for by all parties are denied.
REHEARING GRANTED IN PART AND DENIED IN PART.
NOTES
[1] According to these experts, when the metal draw is closed there is a difference in height in the two leaves.
[2] These experts contend that the projections which were originally on the metal grating to assist with traction have practically worn off causing a smoother surface.
[3] Although the trial transcript indicates that the Doucets proffered individual accident reports from 1990 and 1991, we were unable to locate these reports in the record. However, the DOTD did proffer an enlarged spread sheet which gives information on accidents from 1982 to 1989. Two DOTD experts prepared this exhibit for trial by reviewing individual accident reports. Because the spread sheet was prepared using individual accident reports and was not compiled under section 409, the spread sheet should have been included as evidence.
[4] This percentage was verified by the DOTD expert who studied the individual accident reports.
[5] The entire trial court record in Cousins v. State, Department of Transportation and Development, 8710117 and 8712018, 22nd Judicial District Court, was introduced into evidence in this case. Cousins involved a remarkably similar accident on the Highway 11 bridge. The accident occurred during wet weather conditions on the north draw of the bridge. In the 1990 appeal, we affirmed the trial court's holding that the DOTD had notice of the hazardous conditions on the Highway 11 bridge. Cousins v. State, Department of Transportation, 89-2066, 572 So.2d 1205 (La.App. 1st Cir.1990) (unpublished).
[6] Expert testimony indicates that it would cost only $256,000.00 to remove and replace the metal grate on the Highway 11 bridge. This cost is insignificant when compared with other alternatives considered by the DOTD. One alternative is to construct a bridge parallel to the existing bridge, then widen and rehabilitate the existing bridge. The estimated cost of this procedure is $60 million. Construction of two new bridges would exceed $80 million.

Another alternative is to close the Highway 11 bridge and divert all traffic to the existing I-10 bridges. This would require the construction or modification of interchanges, the addition of lanes and widening of shoulders on I-10. The cost of this alternative is about $55 million.
We are aware that the two DOTD alternatives are costly and require special funding as well as a considerable amount of time to complete. However, in the interest of avoiding future costly judgments, the DOTD should consider replacing the metal grating while waiting for funding for the more costly and permanent alternatives.
[7] The trial judge assigned 0% fault to Paul Doucet. This portion of the judgment has not been appealed.
[8] Although there is a 10 mph discrepancy in Champagne's and the state trooper's testimony, the DOTD experts did not suggest that Champagne's speed was a cause of the accident.
[9] The Doucet's challenged the trial judge's awards of $300,000.00 to Paul Doucet and $1,500,000.00 to Russell Doucet for damages for past and future pain, suffering and mental anguish.
[10] Paul, Michael and Russell Doucet were each awarded $15,000.00 for negligent infliction of emotional distress.
[11] The Doucets assert that the trial judge erred in failing to grant a loss of consortium award to Michael, Russell and Paul. We note, however, that the petition did not assert a loss of consortium claim on behalf of Michael or Russell. While the petition did assert a loss of consortium claim on behalf of Paul, we find that, based on the evidence in the record, the trial judge did not abuse his vast discretion in failing to grant a loss of consortium award to Paul. We find no error in the trial judge's award of $25,000.00 for loss of consortium in favor of Debra Doucet.
[12] In the accident, 60% of Russell Doucet's spinal cord was severed, rendering him an incomplete paraplegic.
[13] Dr. Robert Voogt, testified that Russell would initially require eight hours a day attendant care and that later in life he would require sixteen hours a day. He stated that Russell's life expectancy is 52.1 more years. Because Dr. Voogt did not state when the sixteen hour a day care would begin, the quoted estimate is based on eight hours a day attendant care for 52.1 years.
[1] Champagne's assignments of error were:

1. The trial court erred in finding the state of Louisiana free from negligence based on evidence not supported by trial testimony.
2. The trial court further erred in considering expert testimony on behalf of the defendant to determine whether Herbert Champagne was "inattentive" when there was no testimony on that issue.