808 So.2d 500 (2001)
Nicholas Salvadore SCHIRO
v.
STATE of Louisiana Through the Department of Transportation and Development, ABC Insurance Company, William Nuckley, III, and Liberty Lloyds Ins. Co.
No. 99-CA-2754.
Court of Appeal of Louisiana, Fourth Circuit.
March 21, 2001.
Opinion on Grant of Rehearing in Part April 11, 2001.
*503 Frank J. D'Amico, Jr., Wayne E. Garrett, Wayne E. Garrett, Aplc, New Orleans, Counsel for Plaintiff/Appellee.
Craig J. Robichaux, Talley, Anthony, Hughes & Knight, L.L.C., Mandeville, Counsel for Defendant/Appellant.
Court composed of Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER, Judge MAX N. TOBIAS Jr.
Judge MAX N. TOBIAS, Jr.
In this personal injury case, defendant, the State of Louisiana through the Department of Transportation and Development ("DOTD"), and plaintiff, Nicholas S. Schiro, appeal a trial court judgment rendered in Schiro's favor. We affirm the trial court's judgment.
This action arises from an accident that occurred on the night of 8 February 1990, on the U.S. Highway 11 bridge spanning Lake Pontchartrain from New Orleans to Slidell. At the time, Schiro was a guest passenger in a pickup truck driven by William Nuckley. Nuckley and Schiro were travelling in the southbound lane of the bridge, returning to New Orleans after spending the evening playing pool with a friend in Slidell. Due to dense fog visibility was limited. As Nuckley encountered the grid at the north draw of the Highway 11 bridge, his vehicle angled across the bridge, crossed the centerline, entered the northbound lane, and then struck an adjacent concrete stanchion. As a result of the collision, Schiro and Nuckley were ejected from the vehicle. The vehicle's front end was severed and its engine, transmission, and drive shaft were strewn about the bridge. The remaining part of the vehicle came to rest in the northbound lane and, immediately thereafter, was struck by an oncoming Toyota Camry. Following the accident, the emergency medical team transported Schiro and Nuckley to an area hospital. The results from blood alcohol tests disclosed that Nuckley had a blood alcohol level of .20 and Schiro .17, indicating they were intoxicated at the time of the accident.
Schiro filed suit against the DOTD[1], alleging that the substandard design and construction of the grid and road surface of the Highway 11 bridge caused the accident and his injuries. He further alleged that the DOTD was negligent for failing to properly maintain and inspect the bridge *504 and to warn motorists of its hazardous conditions.
At trial, the court heard the testimony of Nuckley, Schiro, and the investigating officer, as well as eight experts who testified in the area of traffic engineering, accident reconstruction, physics, highway safety, civil engineering, automotive engineering, vehicle dynamics, and blood alcohol analysis. The parties also stipulated at trial to the introduction of expert testimony and evidence from four other cases involving accidents on the Highway 11 bridge: Cousins v. State, Department of Transportation and Development, 89-CA2066 (La. App. 1 Cir.1990), 572 So.2d 1205 (unpublished); Doucet v. Champagne, 94-1631 (La.App. 1 Cir. 4/7/95), 657 So.2d 92; Bertaut v. WayneDodd, 97-0865 (La.App. 1 Cir. 12/22/98), 735 So.2d 130 (unpublished); and Porche v. State of Louisiana, Department of Transportation and Development, 22nd Judicial District Court case no. 87-14932, (which settled after the trial on liability).[2]
Following a bench trial, the trial court rendered judgment in favor of Schiro, awarding him total damages of $1,566,857.43, and assessed 50% fault to Nuckley and 50% to DOTD. In the written reasons for judgment, the trial judge stated in pertinent part:
[T]his Court finds the following defects existed on the roadway at the time of the accident:
1. Irregular rutting of the asphalt roadway in its approach to the North draw
2. Puddling of water in the roadway
3. Passage over a smooth steel plate immediately prior to the grid surface
4. Passage over a concrete filled portion of the grid, holding water
5. Passing over the steel grid, which was missing bars and noticeably worn-down wheel paths
6. Pressure points on the grid surface completely worn down
7. Absence of railings immediately adjacent to the grid surface
All of these conditions produced a very rough and bumpy ride, necessitating driver input as the driver proceeded onto the grid surface.
On appeal, DOTD argues that the trial court's specific findings of fact as to the existing defects on the bridge, the cause of the accident, and fault are clearly wrong and not supported by the evidence in the record. It also argues that the damage award is excessive and not supported by the evidence. Schiro appeals, arguing that the trial court erred in finding Nuckley at fault.
In order for DOTD to be held liable under the circumstances of this case, the trial judge must have concluded (1) that DOTD had custody of the thing which caused the plaintiffs damages, (2) that the thing was defective because it had a condition which created an unreasonable risk of harm, (3) that DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) that the defect was a cause-in-fact of the plaintiffs injuries. Brown v. Louisiana Indemnity Company, 97-1344 (La.3/4/98), 707 So.2d 1240, 1242. A cause-in-fact determination is a factual finding for which appellate courts must accord great deference to the trial court. Cay v. State, Department of Transportation *505 and Development, 93-0887 (La.1/14/94), 631 So.2d 393, 395.
La. R.S. 48:35(A) requires DOTD to "adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance." The statute further mandates that these standards "correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials [AASHTO]."
At trial, Nuckley acknowledged that he and Schiro had consumed several beers while playing pool shortly before the accident. He also admitted that earlier that evening he drank a beer while driving across the Highway 11 bridge from New Orleans to Slidell. Nonetheless, Nuckley claimed that he was not incapacitated or intoxicated when he and Schiro left the pool hall to return to New Orleans via the bridge. As to the weather conditions at the time, Nuckley testified that visibility was not bad but there was mist in the air and the ground was wet. According to him, when he approached the north draw of the bridge and his truck's tires hit the metal grid, the vehicle went to the left. He remembered trying to steer the truck back to the right and that was his last recollection of the incident. Nuckley described encountering the north draw metal grid as "hit[ting] a sheet of ice."
Plaintiff's expert, James R. Clary, Sr., a civil engineer and highway safety engineer, testified at trial that the bridge, on visual inspection, showed no evidence of maintenance for an extended period of time; he noted that DOTD had not complied with its own maintenance schedule. Clary opined that the accident occurred because Nuckley's vehicle lacked sufficient traction once it came upon the metal grid surface to allow the vehicle to respond to steering input.
Earlier, in Doucet, supra, Clary had testified that the Highway 11 bridge was defective because the north draw did not meet AASHTO's standards for bridges and grids and that the bridge's maintenance fell below the standards set forth in the Maintenance Plan Manual developed by DOTD. However, on cross examination in this case, he acknowledged that at the time of Schiro's accident, DOTD had posted on the bridge a "Steel Grid Ahead" sign to warn motorists of the approaching grid and also a "Slippery When Wet" sign with a "35 MPH" advisory speed limit to warn motorists of a potential hazard and to reduce their speed in wet weather. Clary acknowledged that DOTD had complied with the manual on Uniformed Traffic Control Devices by posting the warning signs.
Dr. Herman Hill, an expert in highway safety and accident reconstruction and formerly with the State of Georgia Department of Transportation, also testified for plaintiff. Dr. Hill conducted a site inspection and cited numerous bridge defects, including the lack of shoulders; the absence of a skid resistant surface; the absence of "W" beams and concrete guardrails; uneven metal grating; mismatched leaves; missing and worn transverse sections of metal grating; a low coefficient of friction on the grid approach, the grid itself, and the grid departure; differential friction across the lane's width and within the lane; and an unreasonable posted speed limit for wet conditions. Dr. Hill attributed much of the bridge's surface deterioration to DOTD's allowance of overdesigned weight trucks on the bridge, which caused rutting in the wheel paths.
In Bertaut, supra, Dr. Hill testified that AASHTO standards required metal grids to have skid resistant surfaces. Based on his calculations, Dr. Hill concluded that the north draw had a skid number or coefficient *506 of friction of 32.4 at 40 m.p.h., even without accounting for seasonal and other adjustments. He further estimated that at 50 m.p.h. the skid number would be as low as 23.7, less than the value for wet packed snow. Dr. Hill also explained that a skid number below 30 warranted immediate attention if there was a high volume of traffic. The average daily traffic on the Highway 11 bridge was several thousand vehicles per day. According to him, a disproportionate number of accidents on the Highway 11 bridge occurred in wet weather. Analyzing DOTD accident reports between 1982 and 1986, he found that 63% of the accidents on or near the north draw occurred in wet weather. In light of the data, he concluded that the posted 50 m.p.h. speed limit was not reasonable in wet weather on the north draw metal grate.
Plaintiff's expert in physics and accident reconstruction, Dr. O. Franklyn Griffith, testified that he had conducted several skid tests on the north draw of the Highway 11 bridge in connection with the accident at issue and other cases. Based on his examinations, he, too, found the bridge was defective because the coefficient of friction was too low; transverse and longitudinal bars were missing from the grid; a "step" created by the mismatch of the leaves existed; a differential in friction which causes rotation was present; and inadequate warnings were posted. Dr. Griffith also noted that the coefficient of friction on the north draw of the Highway 11 bridge was far below the standards of safety set by the American Society for Testing and Materials.
Raymond Burkhart, also testifying for plaintiff as an expert in accident reconstruction, testified that after reviewing the photographs of the accident, he concluded Nuckley's pick-up truck would have sustained substantially more damage if it had been travelling at 70 m.p.h., as DOTD claimed. He estimated that Nuckley was travelling at approximately 50 m.p.h., the posted speed limit. Burkart opined that the defective grid and road surface caused Nuckley to lose control of his vehicle, cross the centerline and hit the concrete stanchion. He also concluded that had the "W" guardrail been in place, Nuckley, more than likely, would not have struck the stanchion.
DOTD called the investigating officer, retired Louisiana State Trooper Louis K. Ogle, to testify. Contrary to plaintiff's claim that Nuckley's vehicle struck the side of the bridge just south of the metal grid where the "W" beam was missing and replaced by wire rope, Ogle testified that the impact occurred 100 feet south of the metal grid where the "W" beam was intact. Reviewing the state police photographs, Ogle explained that the Nuckley vehicle pocketed the "W" rail at a point south of the wire rope. Based on his examination of the wreckage, Ogle believed Nuckley was travelling at 75 m.p.h. at the time of the accident and had not applied his brakes prior to striking the side of the bridge. Upon further inspection, he had detected the odor of alcohol on both Nuckley and Schiro and observed other evidence that indicated the men had been drinking. In Ogle's opinion, Nuckley caused the accident by driving under the influence of alcohol and speeding.
DOTD also presented testimony from several expert witnesses. Dr. Christopher G. Shapely, an expert in automotive engineering and vehicle dynamics, testified that he had conducted many "skid trailer tests" on the Highway 11 bridge in connection with bridge accident litigation. Skid trailer testing, he explained, involved "the measurement of the grip of bald tires in front of a stream of water, the measurement of the grip of whole vehicles with *507 real tires, the maneuvering of whole vehicles on the grid and on the pavement, inspection of the bridge, computation of calculations about the effects of disturbances in the pavement over the bridge." Based on these tests, Dr. Shapley concluded that the "step" created by the mismatched leaves of the north draw grid had no effect on a vehicle's path of travel. He explained that the vehicle's refined suspension accommodated for the "bump" by creating an equal and opposite effect on the left and right front tires when the vehicle encountered the grid. As to the missing transverse bars on the metal grid, Dr. Shapely opined that they had no overall effect on the traction between a vehicle's tire and the grid surface. He testified that the few missing bars could not have created a level of force sufficient to cause Nuckley to lose control of the vehicle because the weight of the vehicle would have been distributed evenly among the remaining transverse bars. Dr. Shapley further testified that he found Nuckley's steering caused the vehicle to cross the centerline and enter the southbound lane of travel. After examining the evidence from the accident and hearing the testimony of plaintiff's witnesses, Dr. Shapely concluded that Nuckley was travelling approximately 70 to 80 m.p.h., and never applied his brakes to slow the vehicle prior to hitting the concrete stanchion. Further, the vehicle rotated only after it struck the stanchion. In Dr. Shapely's opinion, none of the conditions of the bridge, individually or collectively, was a cause of the accident.
Larry Peterson, a mechanical engineer qualified as an expert in automotive engineering, vehicle dynamics, and accident reconstruction, testified that DOTD retained him in 1991 to conduct tests on the Highway 11 bridge after several accidents had occurred on the bridge. He testified that he, along with Drs. Shapely, John B. Humphreys, and Olin K. Dart, Jr., performed G-Analyst tests, which entailed hosing down the bridge's surface to simulate rainy conditions, to test for traction and friction. In performing the tests, Peterson testified that he used different model vehicles that were in good operating condition, including a 1977 Ford Maverick, a 1979 Ford Mustang, and a Dodge pick-up truck. Peterson found that he was able to control the vehicle in tests where the speed of the vehicle exceeded 40 m.p.h. He testified that he experienced some rotation only when he intentionally did a two-wheel lock and explained that the two-wheel locking did cause some rotation on the bridge, but that it did not cause his vehicle to leave its lane of travel. Peterson noted that among the vehicles used the test results did not differ significantly. He also testified that he had conducted the same test on the Lake Pontchartrain Causeway bridge and on a bridge on U.S. Interstate 10; the findings were similar. According to him, the coefficient of friction on the Highway 11 bridge was not too low in wet weather conditions. Like Dr. Shapely, Peterson found that Nuckley's steering, not poor traction, caused him to cross the centerline.
In defending plaintiff's claims, DOTD also relied on the testimony of Drs. Humphreys and Dart from prior bridge case litigation. In Doucet, supra, Dr. Humphreys, an expert in traffic engineering and accident reconstruction, testified that he had inspected the Highway 11 bridge for defects and/or other factors which he believed could have contributed to the accidents on the north draw of the bridge. He found that the coefficients of friction for the pavement and grid sections on the Highway 11 bridge were not low enough to create hazardous conditions. He testified that the differential of friction from the pavement to the grid varied from 35 to 40 and from 34 to 41, which, in his opinion, *508 could not have made a difference to a driver.
Dr. Humphreys acknowledged that upon inspection he found several transverse metal bars missing from the metal grid of the bridge. However, he found no load bearing, longitudinal bars absent. The inspection also disclosed no significant difference between the north and south sections of the leaves of the bridge under normal conditions. Like Dr. Shapely and Peterson, both Drs. Humphreys and Dart testified that no condition of the bridge, either alone or in combination, caused the accident.
Robert C. Adams, a licensed civil engineer and former DOTD supervisor, testified for DOTD as an expert in traffic engineering. Adams testified that DOTD used a computer system to identify areas in the state highway system in need of improvement. The system relied on accident reports, the number of vehicles travelling on a particular road, personal observations from local and state officials, and citizen complaints. Adams explained that after inputting the data, the computer generated a list of accident locations, which DOTD engineers used to prioritize road improvement projects. He noted that the Highway 11 bridge had never appeared on the abnormal location list, suggesting there was not an unusually high number of accidents in view of the volume of traffic on the bridge.
An appellate court's review of factual findings is governed by the manifest error-clearly wrong standard. The two-part test for the appellate review of a factual finding is: (1) whether there is a reasonable factual basis in the record for the finding of the trial court, and (2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if no reasonable factual basis in the record for the trial court's finding exists, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence are present, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
The weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. Quinones v. United States Fidelity and Guaranty Company, 93-1648 (La.1/14/94), 630 So.2d 1303, 1308. The sincerity and honesty of the opinions expressed are matters which the trial court is in a particularly advantageous position to determine. Id. Where the testimony of expert witnesses differ, the trier of fact has the responsibility to determine which evidence is the most credible. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1111 (La. 1990). Credibility determinations are subject to the strictest deference, and the manifest error standard demands great deference to the trier of fact's findings. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1313.
In this case, because Trooper Ogle was not qualified as an expert in accident reconstruction, the trial court expressly *509 discounted his testimony as to how and where the impact occurred. The trial court determined that Nuckley's vehicle hit the side of the bridge immediately adjacent to the metal grid surface where the "W" beam was absent. Had the guardrail been in place, the trial court concluded, the vehicle might have rebounded off the rail and back onto the roadway, continuing on its way, rather than striking the concrete stanchion. Thus, the trial court found that the missing "W" beam constituted a hazardous condition that contributed to plaintiff's damages. While we might have concluded differently had we been the trier of fact in this matter, we are mindful that where conflicting evidence is present, the trial court's reasonable evaluations of credibility and inferences of fact should not be disturbed on appeal. Thus, we uphold this factual finding.
Likewise, we uphold the trial court's finding that other hazards on the bridge, including the worn metal grid, missing transverse and longitudinal metal bars from the grid, mismatched grid leaves, a substandard surface, and a low coefficient friction, collectively, created an unreasonable risk of harm to drivers. The trial court found that plaintiff's experts were more persuasive in their evaluation of factors affecting driver input, surface discontinuities, and road traction, and expressly rejected the testimony of DOTD's experts that the Highway 11 bridge was safe. Because it was undisputed that a dense fog existed at the time of the accident, we find the trial court's conclusion that wet weather conditions adversely affected the bridge's grid and pavement surface, creating poor traction for drivers, is not clearly wrong.
The trial court also found that DOTD had actual notice of the bridge's defects because of the prior accidents, the lack of maintenance, and DOTD's failure to comply with its own maintenance schedule. As the record discloses a reasonable factual basis for the trial court's finding, we cannot say that it is clearly wrong in holding that DOTD had notice of the defects in the Highway 11 bridge.
As to the trial court's determination that Nuckley was severely impaired at the time of the accident and liable, in part, for plaintiff's injuries, the evidence in the record clearly supports this finding. Schiro and Nuckley admitted they were drinking beer on the night of the accident. Although Nuckley testified that he was not intoxicated, the trial court accepted the testimony of Dr. Monroe Samuels, an expert in toxicology, who testified to the contrary. According to Dr. Samuels, blood tests disclosed Nuckley had a blood alcohol level of .20, well over the legal limit and sufficient to impair the driver's motor skills, visual perception, and ability to react.
Having upheld the trial court's findings of liability on the part of both DOTD and Nuckley, we next address whether the trial judge was clearly wrong in allocating 50% of the fault to DOTD and 50% to Nuckley.
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), the Louisiana Supreme Court set forth five factors to be considered in apportioning fault: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) the extent of the risk created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
In this case, DOTD was aware that its failure to maintain and repair the Highway *510 11 bridge might eventually result in other accidents. The deteriorated metal grid and road surface posed hazards to motorists. Also, had the "W" guardrail been in place, the force of the impact might have been reduced and plaintiff's injuries significantly less. DOTD alone had the capacity to ameliorate the dangerous conditions. Nonetheless, it is undisputed that 6,000 to 10,000 vehicles per day traversed the Highway 11 bridge in all kinds of weather without incident. No reason exists to believe that these other drivers were exceptionally skillful in avoiding accidents.
Here, Nuckley's negligence set the accident in motion. His intoxication adversely affected his motor skills, visual perception, and ability to react. Notwithstanding the bridge's condition and the weather on the night of the accident, by driving under the influence of alcohol, Nuckley breached his duty to operate his vehicle in a prudent manner, which included the duty to maintain control and exercise caution under existing circumstances. Clearly, the breach of that duty jeopardized the lives and safety of all bridge travelers.
The Louisiana Legislature amended La. Civ.Code art. 2324 by Acts 1996, 1st Ex. Sess. No. 3, to provide that, in a case where liability among tortfeasors is not solidary pursuant to Paragraph A of art. 2324, a joint tortfeasor shall not be liable for more than his degree of fault. In this case, however, plaintiff sustained his injuries in 1990, prior to the 1996 Tort Revision, and, therefore, former La. Civ.Code art. 2324 applies. Thus, DOTD is solidarily liable with Nuckley for 50% of plaintiff's damages if its percentage of fault is more than 0% but no greater than 50%.
The trier of fact is owed great deference in its allocation of fault. Even if the reviewing court would have decided the case differently had it been the original trier of fact, the trial court's judgment should be affirmed unless manifestly erroneous or clearly wrong. Dupree v. City of New Orleans, 99-3651 (La.8/31/2000), 765 So.2d 1002.
If this Court had been the trier of fact, it would have increased significantly the percentage of fault attributable to Nuckley, especially in light of his intoxication and his operating a vehicle at an excessive speed under the circumstances. We note the sign on the bridge specifically warned drivers of slippery conditions when the bridge was wet and posted an advisory speed of 35 m.p.h. Nevertheless, because the evidence in the record supports the trial court's finding that DOTD bears some fault for the subject accident and any apportionment of fault of 50% or less, but greater than 0%, to DOTD will not alter the result in this case, we decline to disturb the trial court's allocation of fault.
DOTD also asserts a separation of powers claim, arguing that if we were to uphold the trial court's finding that DOTD was liable for failure to replace the metal grid on the Highway 11 bridge, we would infringe upon the legislature's prerogative to decide what construction projects DOTD shall perform.
The trial court in its reasons for judgment noted Clary's testimony that it would cost approximately $250,000.00 to $300,000.00 to replace the metal grid and Dr. Hill's criticism of DOTD's allocation of maintenance revenue. The trial court never held DOTD liable for failing to replace the metal grid. Rather, it found DOTD was negligent for not complying with its own maintenance plan and making necessary repairs. We find no merit to DOTD's separation of powers argument.
Finally, DOTD argues that the damage award is excessive and an abuse of the trial court's discretion. The trial court awarded Schiro $566,857.43 in special damages, including $49,321.43 for past medical expenses, $180,000.00 for future medical expenses, $112,536.00 for loss of income *511 from the date of the accident through the date of trial, and $225,000.00 for loss of future earnings, as well as $1,000,000.00 in general damages.
The trier of fact is given much discretion in the assessment of damages. La. Civ.Code art. 2324.1. Upon appellate review, damage awards will be disturbed only when a clear abuse of discretion has occurred. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). That discretion is vast and should rarely be disturbed unless it is, in either direction, beyond that which a reasonable trier of fact could assess under the particular circumstances. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, Maritime Overseas Corp., 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
In making its factual findings, the trial court considered the deposition testimony and reports of Dr. John Olson, the plaintiffs treating physician, Drs. Roberta Bell and Bill Black, neuropsychologists, Drs. James Butler and Ralph Gessner, orthopedists, as well as Dr. Melville Wolfson, an economist. The trial court found that plaintiff had sustained massive skull and head injuries, resulting in mild to moderate brain damage; severe facial injuries, resulting in permanent disfigurement, specifically, uneven eyes and cheekbones; and an open fracture of the left leg, resulting in a 10% disability of the leg.
DOTD claims that, in awarding past and future medical expenses, the trial court failed to consider that Schiro was diagnosed as HIV positive following the accident and that many of his past and future medical expenses are directly related to the HIV illness rather than his injuries as a result of the accident. It further argues that plaintiffs claim for future medical expenses is speculative and not supported by the evidence.
The medical bills reflect that plaintiffs medical expenses through the time of trial totaled $49,321.43. In estimating plaintiffs future medical expenses to be approximately $179,466.00, Dr. Wolfson testified that he took an average of plaintiffs medical expenses for the eight years following the accident and projected it forward, explaining that a thirty-seven year-old plaintiff likely would undergo medical treatment for thirty additional years. Although the past medical bills and Dr. Wolfson's testimony fail to distinguish the medical expenses attributable to plaintiffs accident related injuries from those attributable to his HIV illness, the record indicates that the trial court was well aware of plaintiffs HIV positive status. DOTD offered no evidence to refute the past medical expenses or to show that a distinction in the medical expenses was readily ascertainable. DOTD also failed to introduce any evidence to dispute Dr. Wolfson's testimony. Absent any contradictory evidence, we cannot say the trial court abused its discretion in awarding plaintiff past and future medical expenses in the total amount of $228,787.43.
DOTD also argues that the trial court's awards of past and future lost income are not supported by the evidence in the record.
Schiro testified that he was working full-time as a carpenter installing fireplaces and part-time as a bartender at the time of the accident. Following the accident, he resumed working as a bartender and took other sedentary, part-time positions that did not require the full use of his left leg. Schiro also acknowledged that he had been employed sporadically since the accident because recurring facial and leg pains affected his ability to work. Based on plaintiffs employment history and a yearly base income of $15,201.01, Dr. Wolfson calculated Schiro's lost wages from the 8 February 1990 accident to the June 1998 trial to be $112,356.00. As to the loss of *512 future wages, Dr. Wolfson determined that without plaintiffs return to gainful employment and credit for light duty work, the present value of the loss of his future wages would range from $86,509.00, at a base salary of $15,201.01, to $194,410.00, at a base salary of $20,800.00. Even though the trial court's award of $225,000.00 for loss of income from the date of trial appears high, in view of plaintiffs injuries and the undisputed evidence, we cannot say the trial court abused its discretion in its award of the loss of past wages and the loss of future income.
We note that the trial court gave no specific reasons for awarding plaintiff $1,000,000.00 in general damages. Nonetheless, we can easily ascertain from the reasons for judgment that the trial court carefully considered the plethora of evidence and concluded that the severity of plaintiffs injuries, his permanent disfigurement, and his past and future pain as a result of the accident warranted the award of $1,000,000.00. We find no abuse of the trial court's vast discretion in its award of the general damages.
Accordingly, for the above reasons, we affirm the judgment of the trial court in favor of plaintiff.
AFFIRMED

ON APPLICATION FOR REHEARING
On the application of defendant, the State of Louisiana through the Department of Transportation and Development ("DOTD"), we grant a rehearing limited to a reconsideration of our 21 March 2001 opinion insofar as it affirmed the trial court's allocation of fault of 50% to DOTD and 50% to defendant William Nuckley.
After reviewing the evidence, we determined that had we sat as the trier of fact we would have increased the percentage of fault attributable to Nuckley yet declined to do so because La. C.C. art. 2324 in effect at the time of the 1990 accident provided for solidary liability among joint tortfeasors but capped each defendant's liability at 50% of the plaintiffs recoverable damages. Thus, we concluded increasing Nuckley's fault would not have altered the result reached by the trial court, as DOTD still would have been liable for 50% of plaintiffs damages. This conclusion, DOTD argues, is erroneous in view of the Louisiana Supreme Court's decision in Farbe v. Casualty Reciprocal Exchange, 00-0076 (La.7/6/00), 765 So.2d 994. DOTD did not cite Farbe in its brief filed on 1 August 2000 and failed to mention it in oral argument to us. We also note that to date Farbe has not been cited by any other appellate court.
In Farbe, plaintiff, Abigail Farbe, was injured in 1991 when Stephen Beaver, an intoxicated driver, failed to negotiate a sharp curve on La. Highway 451 and lost control of his vehicle, causing a head-on collision. Beaver was killed instantly. Farbe sued Beaver's estate and DOTD, among others. DOTD filed third party claims against Beaver's estate and his insurer. Prior to trial, Farbe settled with all of the defendants except DOTD. After a bench trial, the trial court allocated fault 80% to Beaver and 20% to DOTD and awarded Farbe damages of $406,866.35. The trial court also granted DOTD a credit of 80% against the damage award because DOTD's right to contribution from Beaver's estate was prejudiced by Farbe's pre-trial settlement with the estate. The appellate court affirmed the finding that DOTD was 20% at fault, but amended the judgment to hold DOTD liable in solido for 50% of the damages pursuant to La. C.C. art. 2324 as it existed in 1991.
The Supreme Court granted certiorari on the solidarity issue and held that because plaintiff's settlement deprived DOTD of the right to enforce contribution against the estate, under La. C.C. articles *513 1803 and 1804 the effect of the settlement was to reduce the amount of recoverable damages against DOTD by 80%. The Court stated, "[t]he fact that DOTD's solidary liablity was capped at 50% under article 2324(B) and Touchard [v. Williams, 617 So.2d 885 (La.1993)] does not alter DOTD's right to receive a settlement credit for Beaver's portion of the debt under [La. C.C.] articles 1803-04."[1]Farbe, supra at 997.
The record in the instant case reflects that DOTD filed a third party demand asserting contribution against Nuckley but the trial court never rendered a judgment on the claim. We surmise the trial court concluded DOTD had no right to contribution after finding DOTD and Nuckley each 50% at fault. Nonetheless, in view of the Farbe decision, increasing Nuckley's fault would have altered the end result in this case because the plaintiff had settled his claim against Nuckley prior to trial. We erred in holding otherwise.
As we stated in our original opinion, Nuckely's intoxication and his operating a vehicle at an excessive speed under the circumstances warranted allocating a higher percentage of fault to him. Therefore, on rehearing we hold that the trial court erred in allocating fault at 50% to Nuckley and 50% to DOTD and amend the trial court's judgment to reapportion fault at 75% to Nuckley and 25% to DOTD.
If plaintiff had not settled with Nuckley prior to trial, DOTD would be solidarily liable for 50% of plaintiff's recoverable damages, but would be entitled to seek contribution from Nuckley for the 25% of that liability that is properly Nuckley's share. However, because plaintiff's settlement has deprived DOTD of the right to enforce contribution against Nuckley, pursuant to La. C.C. articles 1803 and 1804, the settlement effectively reduces the amount of recoverable damages against DOTD by 75%.
Accordingly, we amend the trial court judgment of 30 July 1999 to allocate fault at 75% to Nuckley and 25% to DOTD and, as amended, the judgment is affirmed.
REHEARING GRANTED, JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED
NOTES
[1] The plaintiff also filed suit against Nuckley and his insurer, Liberty Lloyds Insurance Company. He settled his claims against these defendants prior to trial.
[2] The reference to any of these four cases in the text of this opinion is made for the purpose of indicating from what case the expert testimony and/or other evidence has been taken.
[1] We note that the official comments to La. C.C. art. 1804 states:

If the obligation originates in an offense or quasi-offense, however, each obligor's virile portion is proportional to his fault, which is consistent with the idea of comparative negligence adopted in C.C. Arts. 2323 and 2324, as amended by act 1979, No. 431. The implication of the comment is that Article 1804's limitation of solidary liability between obigors applies to percentages of fault as well as the more common situation of quantified dollar amounts.